## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **PETER K. MUKURIA,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:15CV00172 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **HAROLD CLARKE, ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Peter K. Mukuria, Pro Se Plaintiff; Nancy Hull Davidson, Office of the Attorney General, Richmond, Virginia, for Defendants.*

The plaintiff, Peter K. Mukuria, a Virginia prison inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983. Mukuria asserts constitutional challenges to certain classification procedures that have allegedly prevented him from earning his release from the highly restrictive segregated confinement conditions at Red Onion State Prison ("Red Onion"). After review of the record, I conclude that the defendants' Motion for Summary Judgment must be granted.

## I.

Mukuria, who is currently incarcerated at Red Onion, is serving a sentence of forty-eight years, seven months in the custody of the Virginia Department of Corrections ("VDOC"). His convictions include second-degree murder, three counts of grand larceny, disregarding or eluding a law enforcement command, and

malicious wounding. Mukuria has been classified as a segregation inmate since November 2012.

Red Onion and its sister facility, Wallens Ridge State Prison ("Wallens Ridge"), house all VDOC "Level S" inmates. Level S is reserved for inmates who must be managed in a segregation setting.[1] Under current policies, once a VDOC inmate is classified as Level S, officials transfer him to one of these facilities, where he may participate in the Segregation Reduction Step-Down Program designed to help him progress in stages toward a return to the general prison population. (Operating Procedure ("OP") 830.A, at 9-34, ECF No. 22-1.) This OP became effective on February 18, 2013, with the stated purpose to provide "established procedures for incentive based offender management which will create a pathway for offenders to step down from Security level S to lower security levels in a manner that maintains public, staff and offender safety." (OP 830.A(I).) The step-down program is goal-oriented: when inmates exhibit positive behaviors, such as anger management and respect, and succeed in completing the established

---

[1] According to the VDOC operating procedure for security level classification, inmates are classified to Level S based on "segregation qualifiers," including the following: aggravated assault on a staff person or on another offender using a weapon or resulting in serious injury; serious risk of escape; "[c]ommission of a crime of exceptional violence and/or notoriety"; "[e]xcessive violent [d]isciplinary [c]onvictions"; fire setting or rioting in prison that harmed a person or caused extensive property damage; hostage taking; possessing firearms or other weapons; gang activity or leadership; and manipulating staff or displaying predatory behavior. (*See* OP 830.2(IV)(G)).

goals in each stage of the procedure, they are rewarded by moving to the next step and earning its additional privileges.

As described in OP 830.A(III), each newly classified Level S inmate is assessed and assigned to the appropriate privilege level within Level S:  intensive management ("IM"), special management ("SM"), or the reentry unit (reserved for inmates within two years of release).  An inmate is assigned to IM status if evaluators determine that he has "the potential for extreme and/or deadly violence," as indicated by a history of violent disciplinary infractions against staff or other inmates, or an "extensive criminal history and lifestyle that has escalated so that extreme/deadly violence has become a behavior characteristic."  (OP 830.A(III).)  The policy expressly states that "[t]he potential for extreme or deadly violence is not eliminated despite the offender's daily institutional adjustment even when providing more than a year of compliant, polite, and cooperative behavior and attitude." (*Id.*)

Alternatively, an inmate may be placed in IM status because of his "routinely disruptive and threatening pattern of behavior and attitude" or because he is "incarcerated for a notorious crime that puts [him] at risk from other offenders." (*Id.*)  On the other hand, an inmate is assigned to SM status if evaluators find that he has a history of "repeated disruptive behavior at lower level facilities, . . . fighting with staff or offenders, and/or violent resistance" that

-3-

harmed staff or other inmates, but "without the intent to invoke serious harm, . . . kill, or [cause] serious damage to the facility." (*Id.*)

Inmates are further sub-classified under OP 830.A as follows, starting with IM-0, the most restrictive status, and ending with the general population, the least restrictive.

> Intensive Management (IM):
> IM-0
> IM-1
> IM-2
> IM-SL6
> Special Management (SM):
> SM-0
> SM-1
> SM-2
> SM-SL6
> Step-Down—Level VI General Population
> Structured Living—Phase 1 and Phase 2
> Security Level V General Population

The step-down program in OP 830.A is a so-called cognitive program that includes pro-social goals and requires the inmate to complete a workbook set called the *Challenge Series*, remain infraction free, meet responsible behavior goals, and participate in self-improvement and education programs. When an inmate meets the goals designated for a step, he may be advanced to the next step and receive the additional privileges assigned to it.

All Level S inmates in the IM and SM categories are housed in single cells and, until they reach the SM-SL6 stage, are restrained in handcuffs and shackles

-4-

and escorted by two officers whenever they leave their cells. Per policy, they receive meals in their cells (the same types of meals that inmates in general population units receive), receive not less than three showers per week, and have out-of-cell recreation for one hour, five days per week. These inmates generally can have two twenty-minute phone calls per month, one one-hour, non-contact visit per week, non-contact, limited use of radio and television, and limited commissary purchases. They can possess at least two library books per week, receive and send mail, and possess legal and religious materials. The privileges an IM inmate may earn under OP 830.A at IM-1 and IM-2 include more library books per week, more commissary purchases, more non-contact visits or telephone calls, increased TV time and channels, and even limited job possibilities. An inmate progressing to SM-1 or SM-2 can earn even greater privileges.

IM or SM inmates who do not meet the standards for discipline, responsible behavior, self-improvement, and programming can be moved back to a lower step. Some inmates assigned to a lower step may be required to start over with the *Challenge Series*; they must then work with treatment staff to complete its exercises again to achieve positive changes in thought processes and social skills. An inmate's refusal to participate in the step-down program may also be grounds for a reduction in his step assignment back to IM-0 or SM-0, where he may remain,

stripped of the privileges he had earned in the higher step, until he chooses to participate.

Members of the Unit Management Team, a multi-disciplinary group of staff who work in the housing units, track and rate each inmate's progress toward the goals of his assigned step. They rate his behavior every week as poor, acceptable, or good in each of several categories, such as personal hygiene, standing for count, and respect. Counselors rate the inmate's program participation every week as incomplete, complete, or positive effort. Officers in each of these groups are encouraged to communicate with inmates about these ratings — to acknowledge positive performance and motivate improvement where needed. (OP 830.A(IV)(D).)

When an inmate completes the *Challenge Series* curriculum and evaluators deem that he has achieved its behavioral goals in SM-2, he is stepped down in security level from Level S to SM-SL6. (OP 830.A(IV)(F).) At this point, officials assess each inmate and assign him to one of three SL6 program pods geared to safely reintroduce him into a social environment to interact with other inmates and test his readiness for possible transfer to Level V and, eventually, to other non-segregation settings. (*Id.*)

-6-

Inmates in the SL6 step-down pod may progress through two phases.[2]  In SL6 Phase 1, they are still in single cells, but they are permitted to leave their cells unrestrained for movement to the shower and recreation and, gradually, to participate in the *Thinking for a Change* curriculum with other inmates in groups of up to fifteen participants.  (*Id.*)  Inmates in SL6 Phase 2 are double-celled and unrestrained for showers and recreation, they have outside recreation with other inmates for an hour, twice a week, and they can walk to meals with other inmates to eat their meals together in the dining hall.

The IM pathway under OP 830.A is different than the SM pathway.  If an inmate reaches IM-2 status, and officials determine that he cannot progress to the SM steps toward classification to the SL6 pods, he can become eligible for assignment to the lowest security level for an IM status inmate: Level 6-IM, also known as the Closed Pod.  The Closed Pod is expressly designed "to create an opportunity for an increased quality of life for offenders possibly facing a long term in high security."[3]  (OP 830.A(IV)(G)(1).)  Closed Pod inmates continue to

---

[2]  In addition to the SM-SL6 step-down pod, inmates at this stage may be assigned to: (a) the secure allied management ("SAM") pod, designed for inmates who may be vulnerable to victimization because of cognitive impairment or other factors; or (b) the secure integrated pod ("SIP"), designed for inmates who intentionally commit multiple minor disciplinary infractions to stay in segregated housing.  The programming in the SAM and SIP pods differs from the step-down pod and is intended to assess inmates' ability to socialize safely with other inmates and encourage them toward a move to a general population.

[3]  OP 830.A(IV)(G)(2)(g) states:

have single-celled housing, segregated showers and recreation areas, and out-of-cell restraints, shackles, and dual escorts. Closed Pod inmates can, however, earn more privileges than any other group of IM inmates, such as more in-pod job assignments, more programming in-cell and in small groups in secure chairs, video visitation, and longer in-person visitation.

In addition to the weekly progress ratings by the Unit Management Team, OP 830.A(IV)(K)(5) requires that all segregation inmates, including those participating in the step-down program, be routinely reviewed by the Institutional Classification Authority ("ICA"). (OP 830.1, at 35-43, ECF No. 22-1.) According to OP 830.A, Appendices F and G, Level S inmates are to receive an ICA review at least every ninety days. Among other things, the ICA reviews and acts on recommendations for step increases or reductions.

In addition to Unit Management Team review of an inmate's classification status, certain classification decisions are also reviewed by a Dual Treatment Team

---

Restricted freedoms and interaction with staff and other offenders for the IM population is temporary. There is a strong commitment to develop a model to support an improved quality of life and greater opportunities for self-improvement for this dangerous population. The goal is to develop a management strategy that includes reduced restrictions, increased freedoms, and increased unrestrained interactions with others. However, at the time of this writing, guidelines or models are not available for predicting safety with a population that has a proven history of carrying out extreme and/or deadly violence. Once the larger Step-Down plan in general is implemented and stable, attention will be focused on additional IM step-down opportunities.

made up of officials from both Red Onion and Wallens Ridge, by the wardens of the two institutions, or by the VDOC regional operations chief. In addition to this multi-level review scheme, according to OP 830.A(IV)(K)(1)(a), "[a] team external to [Red Onion and Wallens Ridge] will perform an annual review of each [Level S] offender's case." This review includes a reassessment of whether the inmate continues to meet the criteria for the IM or SM path to which he has been assigned. According to OP 830.1(IV)(G), all classification decisions may be appealed through the Offender Grievance Procedure, to which Level S inmates have access.

While Mukuria was confined at Sussex II State Prison ("Sussex II") in November 2012, officials placed him on general detention pending the outcome of an investigation of a serious assault on staff. Using the classification procedures in effect at that time, the ICA assigned Mukuria to Segregation status. His transfer to Red Onion was approved on November 19, 2012, after he received institutional charges for an attempt to kill, use of a weapon, and stealing.[4]

Mukuria first arrived at Red Onion on November 20, 2012. The ICA reviewed his status and recommended his assignment to Level S in December 2012

---

[4] Comments on the ICA hearing documents indicate that Mukuria incurred these charges related to an altercation in which he tried to assault another inmate and stabbed a VDOC staff member, injuring him "so badly that off-site medical attention (emergency surgery) was required in order to save this staff members [sic] life." (Barksdale Aff. Enclosures D & E, at 58, 61, ECF 22-1.)

and February 2013. In May 2013, the ICA recommended that Mukuria be assigned to IM status. After a temporary transfer to another prison facility in May 2013, Mukuria returned to Red Onion in November 2013. The ICA then reviewed his status on December 10, 2013, and recommended him for assignment to IM-0 because of the serious nature of infractions he had incurred in October 2013. Officials again transferred Mukuria to other facilities in February and April 2014. After his return to Red Onion in May 2014, the ICA reviewed his status and recommended his reassignment to Level S and IM-1.

The ICA continued to routinely review Mukuria's assignment, and he remained at IM-1 until July 2015, when he advanced to IM-2. The defendants state that since Mukuria's initial assignment to the step-down program, he has incurred nine institutional disciplinary convictions. In his Complaint, however, Mukuria states that as of April 2015, he had been infraction free for "almost [two] years." (Compl. ¶ 8, ECF No. 1.) The defendants also state that if Mukuria progresses through the step-down program, reaches established goals, and remains infraction free, he can be recommended for a general population classification and housing assignment.

Liberally construed, Mukuria's verified § 1983 Complaint asserts claims that application of OP 830.A as to him has unfairly prolonged his confinement under segregation conditions in violation of the Due Process and Equal Protection

Clauses of the Fourteenth Amendment, and that those conditions themselves have violated the Eighth Amendment's prohibition against cruel and unusual punishment.[5] Mukuria sues VDOC administrators for signing OP 830.A into effect and failing to correct the alleged constitutional violations. He also sues supervisory and treatment officials at Red Onion for the undesirable conditions and for improperly making or failing to correct the allegedly unfair classification decisions imposed on him under OP 830.A without sufficient due process. Mukuria seeks monetary damages and injunctive relief.

In Mukuria's Complaint and other submissions, he complains that OP 830.A discriminates against IM inmates, who suffer a much more restrictive environment than inmates in other forms of administrative segregation; that IM status permanently prevents an inmate from working his way out of segregated confinement at Red Onion by completing the *Challenge Series*, whereas SM status inmates who complete the same series can work their way to general population; that officials arbitrarily assigned him to IM status without allowing him to be

_____

[5] Although Mukuria alleges that IM restrictions prevent him from engaging in group prayer and other unspecified religious practices, he does not contend that any defendant has violated his First Amendment right to free exercise of his religious beliefs. Moreover, his cursory allegations are not sufficient to state a viable claim that any official action or regulation substantially burdened his exercise of his beliefs so as to give rise to any religious rights claim here. *See Turner v. Safley*, 482 U.S. 78, 89 (1987) (holding that even if "a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests"); *see also Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (noting that a prisoner raising a First Amendment claim has the burden of disproving the validity of prison regulations).

-11-

present or offer argument, contradictory testimony, witnesses, or evidence;[6] and that he remains in IM-2 status despite his participation in the *Challenge Series* and another education program and despite his remaining free from disciplinary infractions for months.

Mukuria also complains about the limited activities and privileges provided to IM status inmates. They are not permitted to have recreation outside or in a group setting and cannot pray with others in group religious services. Finally, Mukuria complains that it is the Dual Treatment Team, rather than the ICA, that recommends any changes to an inmate's progress in the step-down program. As a result of his IM status, Mukuria alleges that he is unable to qualify for parole or good conduct time.

The defendants have filed a Motion for Summary Judgment, supported by copies of OP 830.A, its charts of IM and SM requirements, and its progress report forms. They also present the affidavit of Red Onion Warden Earl Barksdale, which describes these and other relevant procedures as well as Mukuria's progress through the step-down procedures.

---

[6] Mukuria raises this allegation in a Motion to Amend that I will grant. (*See* ECF No. 24.)

-12-

## II.

### A. Standard of Review.

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

I must draw all reasonable inferences from the facts in favor of Mukuria, the nonmoving party. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004). Detailed factual allegations in a verified, pro se complaint may be sufficient to withstand a motion for summary judgment with supporting affidavits containing a conflicting version of the facts. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) ("[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." (emphasis omitted) (citation omitted)). However, Mukuria cannot defeat the defendants' properly supported summary judgment motion with mere groundless generalizations or speculation. *Glover v.*

-13-

*Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact.").

### B. Due Process.

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "To state a procedural due process violation,[7] a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

As a convicted prisoner, Mukuria does not have an inherent, constitutionally protected liberty interest in release from a more restrictive security classification. *Id.* at 221-22. A state-created liberty interest may exist, however, if Mukuria (a)

---

[7] Mukuria may also be contending that OP 830.A violates his substantive due process rights. Such a claim fails, however. It is well established that "the Due Process Clause affords [the inmate] no greater protection than does the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 327 (1986). Thus, Mukuria's claims that living conditions in segregation constitute punishment without a legitimate penological purpose and inflict physical harm on him "fall squarely within the ambit of the Eighth Amendment — not the due process clause." *See Prieto v. Clarke*, 780 F.3d 245, 251 (4th Cir. 2015). Therefore, I will address Mukuria's complaints about the ill effects of living conditions at Red Onion separately, under the applicable legal standard for Eighth Amendment claims.

-14-

points to "a basis for an interest or expectation in state regulations" in avoiding the conditions of his confinement under the segregation classification scheme at Red Onion, *Prieto*, 780 F.3d at 250; and (b) shows that those conditions "impose[] atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995). Only if Mukuria makes both showings does the Due Process Clause require a particular measure of procedural protection before he can be deprived of his liberty interest. *Id.*

Mukuria is challenging, not his classification to Level S, but rather, his classification to IM status instead of SM status under OP 830.A and the subsequent classification adjustment decisions within that pathway. He apparently believes that these procedures stand in his way of being released from segregation to general population conditions. The defendants agree that OP 830.A "creates an expectation that 'S' level offenders will receive reviews of their classification status." (Defs.' Mem. Supp. Summ. J. 21, ECF No. 22.) Specifically, OP 830.A(IV)(K)(5) and Appendices F and G provide that the ICA will review inmates' status every ninety days and decide whether to advance them to the next status level in the step-down procedures. I conclude that this periodic review policy creates a potential liberty interest for Mukuria in being released from the restrictive conditions of his current security classification. *See Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2016) (finding that state prison's policy requiring

Case 7:15-cv-00172-JPJ-RSB   Document 26   Filed 09/27/16   Page 15 of 30   Pageid#: 241

periodic classification reviews for segregation inmates created potential liberty interest).

I must next determine if Mukuria's continued confinement in the various segregation classifications within the OP 830.A categories imposes "atypical and significant hardship" compared to the "ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. The "conditions dictated by a prisoner's conviction and sentence are the conditions constituting the 'ordinary incidents of prison life' for that prisoner." *Prieto*, 780 F.3d at 253. Neither party has provided me specific information about restrictive conditions, if any, dictated by the sentence Mukuria is serving. Given the fact that Mukuria was not assigned to Level S or Red Onion immediately after entering the VDOC and received these assignments only after incurring serious disciplinary infractions at other prisons, I will use the general population status as the normative baseline for his due process claim. *See Incumaa*, 791 F.3d at 527 (concluding "that the general population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence").

The atypical hardship requirement is difficult to satisfy. Mere limitations on privileges, property, and activities for administratively segregated inmates, and even disciplinary action "in response to . . . misconduct fall[ ] within the expected

-16-

perimeters of the sentence imposed by a court of law." *Sandin*, 515 U.S. at 485; *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (holding that "changes in a prisoners' [sic] location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges — matters which every prisoner can anticipate are contemplated by his original sentence to prison — are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage the prisons safely and efficiently"). It is well established that a temporary assignment to segregated confinement — thirty days or even six months, with reduced privileges, few out-of-cell activities or socialization opportunities, and heightened security measures — is not atypical or significant hardship. *See Sandin*, 515 U.S. at 485-86; *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (finding six months under conditions dictated by administrative segregation policies was not atypical under *Sandin*). Moreover, "[t]he State's first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Wilkinson,* 545 U.S. at 227. Thus, "correctional officials . . . must have substantial discretion to devise reasonable solutions to the problems they face" in maintaining prison security and safety. *Florence v. Bd. of Chosen Freeholders*, 132 S. Ct. 1510, 1515 (2012).

-17-

Most importantly, the Supreme Court has consistently employed a due process analysis that encourages prisons to implement written management policies while minimizing the involvement of the federal courts "in the day-to-day management of prisons." *Wilkinson*, 545 U.S. at 222 (citing *Sandin*, 515 U.S. at 482-83). "This approach . . . provides inmates and prison administrators with clear notice of a prisoner's rights, but it also permits a given state to codify procedures establishing very restrictive confinement conditions." *Prieto*, 780 F.3d at 255. District courts must respect the Supreme Court's "judgment that this trade-off strikes the correct balance between the dictates of the Due Process Clause and the pressures on state correctional systems." *Id.*

In *Wilkinson*, without a point-by-point comparison of segregation and general population conditions, the Supreme Court found that inmates had a protected liberty interest in avoiding assignment to a particular state "supermax" prison. In reaching this conclusion, the Court carefully distinguished the supermax conditions from normal segregation unit conditions on three grounds. First, inmates in the supermax facility were "deprived of almost any environmental or sensory stimuli and of almost all human contact."[8] *Wilkinson*, 545 U.S. at 214.

---

[8] The conditions at the supermax at issue in *Wilkinson* included the following: "Almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room." *Id.* at 223-24. The Court noted, however, that the lack of human contact was the most distinctive of these living

-18-

Second, they were assigned for "an indefinite period of time, limited only by [the] inmate's sentence." *Id.* Third, once assigned to supermax, "[i]nmates otherwise eligible for parole lose their eligibility while incarcerated" at the facility. *Id.* at 215. The Court stated: "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.* at 224.

Similarly, in *Incumaa*, the Fourth Circuit found a protected liberty interest in avoiding assignment to South Carolina's supermax based on the isolating and restrictive nature of the living conditions combined with the length and indefiniteness of the plaintiff's twenty-year confinement there. 791 F.3d at 531-32. In addition to conditions similar to those at issue in *Wilkinson*, the plaintiff in *Incumaa* was subjected to "a highly intrusive strip search every time he [left] his cell." *Id.* at 531.

Prison policies gave rise to the indefinite terms of supermax confinement that concerned the courts in these cases. In *Wilkinson*, prison policies provided "no indication how long [an inmate] may be incarcerated [at the supermax] once assigned there." 545 U.S. at 215. In addition, policy required infrequent review of the continued appropriateness of an inmate's specific segregation status: once

_____

conditions and that the conditions were atypical when combined with the additional factors of indefinite duration and disqualification for parole. *Id.* at 224.

initially, thirty days after his arrival, and annually thereafter. *Id.* at 217. The policy at issue in *Incumaa* required review of the plaintiff's status every thirty days by an institutional classification committee ("ICC"), but that review process provided no clear criteria for him to become suitable for release from the supermax. 791 F.3d at 522-23. Assigned to the supermax as a member of a security threat group, policy provided that the plaintiff could nevertheless qualify for reclassification and release from the supermax by achieving an "improvement in behavior level." *Id.* Policy further defined "behavior level" as including a clear disciplinary record and the ICC's evaluation of the plaintiff's overall compliance with "policies and procedures" of the institution. *Id.* at 522. In twenty years, the plaintiff had never incurred a disciplinary infraction, but the ICC repeatedly recommended his retention at the supermax without providing any behavioral basis for doing so. *Id.* at 521-23.

Without question, VDOC inmates classified to Level S and IM status are confined under highly restrictive conditions at Red Onion, including single-cell assignment, limited out-of-cell activity and face-to-face contact with other inmates, and movement outside the cell only in full restraints and with dual escorts. Out-of-cell movement may also involve a visual strip search, although the parties do not present evidence on this issue. The mere existence of these conditions at Red Onion, however, does not render confinement there atypical or significantly harsh,

because general population inmates can expect temporary terms in segregated confinement under similar restrictions. *See Sandin*, 515 U.S. at 486 (thirty days); *Beverati*, 120 F.3d at 504 (six months).

Mukuria contends that the conditions imposed under OP 830.A are atypical and significant, particularly IM status, because it is allegedly permanent. It is true that as long as an inmate remains assigned to any step within the IM pathway, he will not be assigned to full general population conditions. The least restrictive step an IM inmate may reach is the Closed Pod, which imposes conditions that are more restrictive of out-of-cell movement and socialization than those of any other, nonsegregation housing assignment. However, the defendants' evidence and the terms of OP 830.A and other VDOC procedures indicate that an inmate's assignment to IM status is routinely reevaluated, both during his informal ICA reviews conducted every ninety days and during his annual, formal ICA review. Mukuria offers no evidence to refute the defendants' evidence that, at any of these reviews, evaluators could determine that his progress toward meeting the goals of the *Challenge Series* and his continued infraction-free behavior warrant an assignment to a step on the SM pathway. From the SM pathway, Mukuria admits, he could progress to a general population assignment and eventually transfer to a lower security level prison.

Mukuria's own classification history also belies the contention that assignment to IM status is a permanent or indefinite assignment to the harshest segregation conditions. He was classified to IM-0 status after multiple disciplinary infractions, some of them involving serious injury to a staff member, but he did not remain at IM-0. Because he has participated in the OP 830.A step-down program and remained charge free, Mukuria has moved, first to IM-1 and then to IM-2. In so doing, he has earned additional privileges, including access to additional library books, visits, and phone calls. He can also now participate in education programming in addition to the *Challenge Series*.

After careful review of OP 830.A, I conclude that this step-down procedure addresses and alleviates the isolating conditions and indefiniteness identified in *Wilkinson* and *Incumaa* as distinguishing factors of "atypical and significant" hardships presented by a prison's long-term segregation scheme. An IM-0 status inmate is subject to long-term, restrictive conditions, but that status need not be permanent or indefinite if the inmate chooses to participate in the step-down procedures. OP 830.A provides behavioral criteria for the inmate to qualify for incremental reductions of restrictions and increases in privileges. With concerted effort to change his thinking and behavior, he can earn his way to enjoyment of additional social interaction and activity while in segregated confinement. OP 830.A's steps allow him to make measurable progress toward reclassification to

-22-

lower security statuses and, ultimately, to transfer to general population conditions. As such, under OP 830.A, an inmate's confinement in segregation at Red Onion is, for Mukuria and a likely majority of inmates, only as lengthy and restrictive as dictated by his own effort and behavior.

Mukuria complains that some officials purposely use OP 830.A to target certain inmates for IM status in order to prolong their segregated confinement. I conclude that the team assessment approach and the multi-level, internal and external classification review procedures built into OP 830.A and other VDOC policies protect against such willful action arbitrarily denying any one inmate the ability to move through the steps. Moreover, if Mukuria believes that procedural errors or miscalculations occurred during a classification proceeding, he can challenge such errors through the Offender Grievance Procedure, OP 830.1(IV)(G), or file a request for an interim review of his classification based on procedural or calculation errors. (*See* OP 830.1(IV)(E).)

Mukuria also fails to state facts showing that IM status makes him ineligible for parole or good conduct time. Specifically, he provides no facts suggesting that he is eligible for discretionary parole consideration on the sentence he is serving. Even if he could prove parole eligibility, I find no provision in OP 830.A itself that revokes an inmate's eligibility for discretionary parole consideration. Parole board members may, legitimately, consider Mukuria's Level S classification, or his

Case 7:15-cv-00172-JPJ-RSB   Document 26   Filed 09/27/16   Page 23 of 30   Pageid#: 249

particular subclassification under OP 830.A, as a reflection of disciplinary problems and other behavioral issues that signal his unsuitability for parole release at present.

Mukuria also fails to state facts indicating that his IM status assignment, rather than his disciplinary record or other factors, caused his alleged inability to earn good conduct time. I find no evidence in the record that his classification to IM status inevitably affects the length of his confinement so as to trigger a separate, constitutionally protected liberty interest in avoiding that classification. *Sandin*, 515 U.S. at 487.

For the reasons stated, I find no material fact in dispute on which Mukuria can establish that his confinement at Red Onion under OP 830.A is atypical and significantly harsh compared to conditions contemplated by his sentence. Conditions in IM confinement there, while restrictive, can improve in defined stages based on Mukuria's own efforts toward cognitive and behavioral changes. Indeed, the OP 830.A procedures themselves prevent confinement at Red Onion from falling into the category of indefinite isolation identified in *Wilkinson* and *Incumaa* as triggering constitutional due process protections. Thus, I conclude that Mukuria has no constitutionally protected liberty interest in avoiding any particular security classification or reclassification under OP 830.A. Therefore, he also has no actionable claim under § 1983 that any particular procedural protection is

-24-

constitutionally required during the OP 830.A classification proceedings. *Sandin*, 515 U.S. at 486-87.

Mukuria also has no claim under § 1983 that any of the defendants have misconstrued or misapplied the OP 830.A procedures themselves. Mukuria raises complaints about the procedures used to reduce his classification to IM status and the reason given for that change; the alleged failure to provide him with notice or a chance to be present to offer counter evidence; his low step status despite months of being infraction free; and officials' alleged use of the Dual Treatment Team, rather than the ICA, to recommend changes. However, all these alleged actions are, at most, violations of the OP 830.A policies themselves. State officials' failure to abide by state procedural regulations is not a federal due process issue, and is, therefore, not actionable under § 1983. *Riccio v. Cty. of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990) ("If state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.").

For the stated reasons, the defendants are entitled to judgment as a matter of law as to Mukuria's claims that one or more of them violated his constitutional rights by changing his classification under OP 830.A without due process. I will grant the Motion for Summary Judgment on Mukuria's due process claims accordingly.

C.  Equal Protection.

The Equal Protection Clause[9] generally requires the government to treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). It "does not take from the States all power of classification, but keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks and citations omitted). Thus, to prove an equal protection claim, an inmate "must first demonstrate 'that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" *Id.* (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). He must next show that the policy is not "reasonably related to [any] legitimate penological interests." *Veney*, 293 F.3d at 732 (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)). This element requires the inmate to "allege facts sufficient to overcome the presumption of reasonableness applied to prison policies." *Id.* Mukuria does not state facts supporting these necessary elements of his equal protection claim.

First, Mukuria has not demonstrated that he was similarly situated to inmates in SM status when officials classified him to IM-0 status. Mukuria's assaultive

---

[9] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

behavior and other disciplinary infractions warranted different treatment, for security reasons, than he had previously received at other VDOC prisons. Thus, officials could also lawfully treat him differently from other segregation inmates with histories of less serious, violent, or recent disciplinary convictions.

Second, Mukuria does not show that he has been treated differently than any other inmate during periodic reviews for step changes. Neither Mukuria nor any other Level S inmate can change his step status under OP 830.A merely by avoiding disciplinary convictions and being polite. A step change requires his progress on the *Challenge Series* curriculum and the classification officers' recognition that he is working to make positive changes in his thinking and behavior. Moreover, Mukuria's steady progress from IM-0 to IM-1 to IM-2 demonstrates that officials are not purposely discriminating against him or otherwise holding him back from working his way toward eligibility for lower step-down levels.

Third, while the OP 830.A step-down procedure purposefully treats SM and IM status inmates differently, these differences are rationally related to legitimate governmental purposes. Namely, this procedure reasonably uses the incentive of earning increased privileges and lower restrictions to encourage improved offender behavior and self-development "in a manner that maintains public, staff and offender safety." OP 830.A(I). The logical connections between the policy's

provisions and the furtherance of its legitimate penological goals are self-evident. *See Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) ("[I]nternal [prison] security [is] perhaps the most legitimate of penological goals.").

For the stated reasons, I find no material dispute of fact on which Mukuria could prove an equal protection violation here. Therefore, I conclude that the defendants are entitled to summary judgment as a matter of law and will grant their motion on this claim.

## D. Eighth Amendment.

Mukuria's final challenge to OP 830.A asserts that his status under OP 830.A offends the prohibition against cruel and unusual punishment of the Eighth Amendment, which "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). "[T]he Constitution does not mandate comfortable prisons," however, and conditions that are "restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981). It is well established that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (internal quotation marks and citations omitted).

To sustain an unconstitutional conditions claim, a prisoner must show that: (1) objectively, the deprivation was sufficiently serious, in that the challenged

official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). The prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

Mukuria's allegations do not support a claim that he has suffered any Eighth Amendment violation while subject to the living conditions under OP 830.A at Red Onion. Mukuria does not allege that he has been deprived of any necessity for life, such as food, shelter, or medical care. Rather, he complains about higher levels of restraint and fewer privileges. He fails to allege that these restrictions have caused him any serious or significant harm. For the stated reasons, I find no material dispute of fact on which Mukuria could prove his claim that he has been subjected to unconstitutionally cruel conditions. Accordingly, I will grant the defendants' Motion for Summary Judgment as to his Eighth Amendment claim.

III.

For the reasons stated, I conclude that Mukuria's constitutional challenges to OP 830.A are without merit, and the defendants are entitled to summary judgment as a matter of law. It is accordingly **ORDERED** that the plaintiff's Motion to Amend (ECF No. 25) is GRANTED; but the defendants' Motion for Summary Judgment (ECF No. 21) as to the Complaint as amended is GRANTED.[10]

A separate judgment will be entered herewith.

ENTER:   September 27, 2016

/s/  James P. Jones
United States District Judge

---

[10] It is also **ORDERED** that all claims against the defendant identified as the Dual Treatment Team are DISMISSED as legally frivolous, pursuant to 28 U.S.C. § 1915A(b)(1). This defendant is not a "person" subject to suit under § 1983. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 70-71 (1989). In any event, for the reasons stated, Mukuria has stated no actionable § 1983 claim against any of the individual members of this team.